UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| MUSHTAQ AHMAD, Plaintiff, v. WHITE PLAINS CITY SCHOOL DISTRICT, *et al.*, Defendants. | No. 18-CV-3416 (KMK) OPINION & ORDER |

APPEARANCES:

Mushtaq Ahmad
New City, NY
*Pro se Plaintiff*

Gerald S. Smith, Jr., Esq.
Silverman and Associates
White Plains, NY
*Counsel for Defendants*

KENNETH M. KARAS, United States District Judge:

Pro se Plaintiff Mushtaq Ahmad ("Plaintiff") brings this Action against White Plains City School District ("WPCSD"); Howard Smith, Superintendent of WPCSD ("Smith"); and Ellen Doherty, Principal of White Plains High School ("Doherty"; collectively, "Defendants"), under Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. §§ 2000e, *et seq.*; 42 U.S.C. §§ 1983 and 1985; and the Due Process Clause of the Fourteenth Amendment, along with common law claims. (Third Am. Compl. ("TAC") (Dkt. No. 66).) Before the Court is Defendants' Motion To Dismiss the Third Amended Complaint ("TAC"), pursuant to Federal Rule of Civil Procedure 12(b)(6) (the "Motion"). (*See* Defs.' Not. of Mot. (Dkt. No. 69).) For the reasons to follow, Defendants' Motion is granted in part and denied in part.

<u>I.  Background</u>

<u>A.  Factual Background</u>

The following facts are drawn from Plaintiff's TAC and are assumed to be true for the

purpose of resolving the instant Motion.

Plaintiff is a 62-year old male.  (TAC ¶ 4.)  He is a naturalized U.S. citizen originally

from Pakistan, and a practicing Muslim.  (*Id.* ¶¶ 4, 8.)  On August 25, 2016, WPCSD

interviewed Plaintiff for a position as a chemistry teacher.  (*Id.* ¶ 9.)  WPCSD ultimately hired

Plaintiff as a "leave replacement chemistry teacher against a permanent vacancy" at White Plains

High School ("WPHS"), which had an opening due to the death of the prior chemistry teacher.

(*Id.* ¶¶ 9–10.)  Plaintiff did not receive new teacher orientation from WPCSD or WPHS.  (*Id.*

¶ 11.)

After Plaintiff was hired, John Orcutt ("Orcutt"), the Assistant Principal of WPHS and a

former colleague of Plaintiff's at Ramapo High School, told other WPHS science teachers that

Plaintiff had been terminated from Ramapo High School, and that he had an ongoing

discrimination lawsuit against East Ramapo Central School District ("ERCSD").  (*Id.* ¶ 12.)[1]  In

retaliation for Plaintiff's lawsuit against ERCSD, "the Jewish employees of WPCSD" began to

remove laboratory equipment from Plaintiff's classroom to "intentionally create a hardship on

Plaintiff and to make Plaintiff fail due to unequal access to the lab equipment."  (*Id.* ¶ 13.)  When

Plaintiff asked about the missing equipment, he was told by Dougherty, a chemistry teacher, that

"Mr. Braswell (an African American chemistry teacher) stole it[,] and I don't speak to him."  (*Id.*

---

[1] Plaintiff notes that the other science teachers Orcutt told about the lawsuit included
Mark Wolstencroft ("Wolstencroft"), who was also Plaintiff's mentor; Cairenn Broderick
("Broderick"), who was also President of the White Plains Teachers Association ("WPTA");
Vincent Dougherty ("Dougherty"); and Akiva Friedman ("Friedman").  (TAC ¶ 13.)

(quotation marks omitted).)  Several days later, Dougherty told Plaintiff, while in the presence of "Mr. Chen," another chemistry teacher, that Friedman, "a Caucasian chemistry teacher," had removed the equipment from Plaintiff's classroom.  (*Id.*)  Plaintiff also alleges that Dougherty made fun of Plaintiff's clothes, shoes, tie, sweaters, shirts, coats, and lab coat on numerous occasions, and "called him a hotel waiter based on his facial features, race, skin color[,] and national origin," stating that "when he goes to [a] hotel[,] he sees so many people from [the] Indian Subcontinent working as hotel waiters."  (*Id.* ¶ 18.)

Plaintiff also asserts, "upon information and belief," that "the Jewish employees of WPCSD . . . coached and manipulated students on the basis of race, religion[,] and national origin[] against Plaintiff and encouraged them to create problems for Plaintiff."  (*Id.* ¶ 17.)[2] Plaintiff specifically alleges that Hirsch, a guidance counselor of a student identified as "S.R.," held "numerous meetings" with S.R. to "coach her against Plaintiff."  (*Id.* ¶ 20.)  According to Plaintiff, Hirsch admitted to having meetings with this student at which they discussed Plaintiff. (*Id.*)  Thereafter, "[u]nder the advice of . . . Hirsch and . . . Dougherty," and in retaliation for Plaintiff's lawsuit against ERCSD, S.R. "made numerous false allegation[s] to Plaintiff's supervisor[,] Dr. Doty."  (*Id.* ¶ 21.)  Specifically, S.R. alleged that (1) Plaintiff was not teaching chemistry to her class, and that she was learning chemistry on her own from a textbook; (2) Plaintiff did not issue textbooks to her class; (3) Plaintiff had failed to explain "chemistry concepts" to her class, and she had instead explained those concepts to the class on the board; and (4) her class would not be prepared for the Regents Exam in June.  (*Id.*)  Plaintiff asserts that

---

[2] Plaintiff identifies Doherty; Dr. Margaret Hawthorne Doty ("Dr. Doty"), Coordinator of Science and Engineering; Jeffrey Hirsch ("Hirsch"), a guidance counsel; Wolstencroft; Dougherty; Friedman; and Broderick as these employees.  (TAC ¶ 17.)

he "did see S.R. talking to . . . Dougherty, and, thereafter, advising Plaintiff to visit . . . Dougherty's classroom."  (*Id.* ¶ 22.)

On an unspecified date, Wolstencroft, who "work[ed] under the Principal," asked Plaintiff about the status of his lawsuit against ERCSD.  (*Id.* ¶¶ 14, 16.)  When Plaintiff informed him that it was on appeal before the Second Circuit, Wolstencroft stated that "he knew about it and knows everything about [Plaintiff's] lawsuit against East Ramapo."  (*Id.*)  Wolstencroft also told Plaintiff on an unspecified date, "Mush, you are a dumb ass; you did not do your homework."  (*Id.* ¶ 15 (quotation marks omitted).)  Plaintiff asked Wolstencroft what homework he was referencing, to which Wolstencroft replied that Plaintiff would find out later in the year.  (*Id.*)  By the end of the year, Plaintiff had been "removed from his classroom, detained in isolation against his will, paraded through the hallways like a criminal[,] and barred from going on to the property owned by WPCSD."  (*Id.*)  Wolstencroft also said to Plaintiff at an unspecified time, "[W]e don't like colored people in the department," and once admitted that Wolstencroft had been the subject of an investigation due to "racism charges" against him, and that the entirety of the school staff was required to undergo "some type of training" because of Wolstencroft's actions, but also that no one took action against Wolstencroft "due to his [w]hite race" and "connections with higher-up administrators."  (*Id.* ¶ 16 (quotation marks omitted).)

One day, Wolstencroft told Plaintiff to paste WPCSD's "Discipline Guidelines" on each lab station in his classroom, "and enforce them in their totality or get fired (terminated) by an Irish Jewish principal (. . . Doherty)."  (*Id.* ¶ 23.)  In December 2016, Plaintiff complied with this directive, posting the Discipline Guidelines on each lab station and informing his students that the rules would be enforced.  (*Id.* ¶ 24.)  The Guidelines included a rule indicating that use of electronic devices was an infraction, and that "possible consequences" included confiscation of

4

the electronic device.  (*Id.* ¶ 26 (quotation marks omitted).)  On December 20, 2016, Plaintiff

attempted to confiscate a cell phone from a student who was violating this policy.  (*Id.* ¶ 25.)

However, the student, identified as "O.A.," failed to comply.  (*Id.* ¶¶ 27, 50.)  The following day,

Doherty met with Plaintiff and told him that he would be re-assigned to the "science teachers'

work area" and that he was no longer allowed to interact with O.A.  (*Id.* ¶ 28.)  Doherty did not

provide Plaintiff with any reasons for his reassignment and, according to Plaintiff, acted in

violation of Article X, Section A2 of the Collective Bargaining Agreement (the "CBA"), which

requires that "[c]hanges in assignments after notification shall be made only as required by the

best interests of the [s]chool [d]istrict.  In such an event, the teacher affected shall be notified of

the change in writing and[] shall be given an explanation of the reason for the change."  (*Id.* ¶ 29

(quotation marks omitted).)  According to Plaintiff, no disciplinary action was taken against O.A.

(*Id.* ¶ 50.)

On the same day, Smith met with Doherty and Broderick, where he allegedly "conspired,

colluded[,] and planned Plaintiff's termination[,] and delegated [related] tasks to [Doherty]

and . . . Broderick."  (*Id.* ¶ 30.)  On December 22, 2016, Friedman informed Plaintiff that he was

being fired and would not be allowed to come back to WPHS.  (*Id.* ¶ 19.)  Also on December 22,

2016, "under . . . Doherty's order," Doty brought Plaintiff to "a small room inside the main

office," and ordered him to "sit in isolation" "without providing any reason or explanation."  (*Id.*

¶ 31.)  Doty told Plaintiff that he could not leave the room, where Plaintiff was "detained in

isolation against his will."  (*Id.* ¶ 33.)  The room was guarded by a police officer "on the basis of

Plaintiff's race and religion," who was directed "not to let Plaintiff go out of the room wherein

he was detained against his will."  (*Id.* ¶ 34.)  Plaintiff alleges that these actions caused

"emotional distress and psychological harm," including "anxiety, stress, and distress."  (*Id.*

¶¶ 31, 33–34.)  Eventually, Broderick and John Hughes ("Hughes"), the "Grievance Chairperson of WPTA," arrived and, "according to the task delegated to them by the superintendent [presumably Smith] . . . tried to force Plaintiff to sign a waiver . . . not to sue WPCSD in any court for their unlawful actions."  (*Id.* ¶ 35.)  When Plaintiff refused to sign, Broderick and Hughes "demanded the school keys back from Plaintiff" and "told him that the Superintendent of schools had told . . . Broderick the previous night that he was going to terminate Plaintiff," and that Plaintiff would not be allowed to enter the WPHS building.  (*Id.* ¶ 36.)  When Plaintiff informed Broderick and Hughes that his personal belongings were in his classroom, Broderick and Hughes, acting "on behalf of the school administration," "paraded Plaintiff," accompanied by a police officer, through the hallways, in the presence of students and other school staff, forced Plaintiff to remove his belongings from his classroom, and took the keys away from Plaintiff.  (*Id.* ¶¶ 37–38.)

According to Plaintiff, Doherty, Smith, and "Dr. Reynolds," the "Assistant Superintendent of Human Resources," failed to show "any written complaint or document against him by any student or administrator," and did not provide Plaintiff with copies of any complaints.  (*Id.* ¶ 39.)  As such, Plaintiff alleges that "Defendants (on behalf of WPCSD)" deprived Plaintiff of his "right to due process" included in WPCSD's Code of Conduct, which sets forth that "school personnel have the right to disclosure of all policies, rules, and procedures regarding expectations for behavior.  They also have the right to due process."  (*Id.* ¶ 40 (quotation marks omitted).)

Also on December 22, 2016, Dr. Reynolds "promised" Plaintiff that a "full investigation" would be conducted of Plaintiff's complaints of "discrimination, harassment, hostile and unsafe work environment."  (*Id.* ¶¶ 41, 54.)  Dr. Reynolds subsequently informed Plaintiff that the

"school attorneys" would conduct the investigation, but Plaintiff has never been provided with an "investigation report." (*Id.* ¶ 54.) On December 23, 2016, Plaintiff received a letter from Dr. Reynolds directing Plaintiff not to enter WPCSD property without prior permission, and to refrain from contacting or communicating with any WPCSD staff members, students, or parents, "other than [the] Central Office or union representative(s) . . . pending the meeting." (*Id.* ¶ 42.) On January 18, 2017, the meeting referenced in Dr. Reynolds's letter took place and was attended by Broderick, Dr. Reynolds, "and others." (*Id.* ¶ 43.) Plaintiff alleges that during this meeting, he fainted "due to the injuries caused or aggravated by the actions of the Defendants," (*id.*), and that WPCSD and WPTA "failed in transporting Plaintiff to a nearby hospital," (*id.* ¶ 44).

On February 3, 2017, Smith "reiterated . . . that he would recommend . . . Plaintiff's termination." (*Id.* ¶ 45.) However, on February 13, 2017, Smith recommended to the School Board that it should "retroactively convert Plaintiff's leave-replacement appointment to a probationary appointment," which the Board approved. (*Id.* ¶ 46.) Plaintiff still was not allowed to return to work, and on February 17, 2017, Smith "reiterated that he would recommend . . . Plaintiff's termination even when Plaintiff had not gone back to WPHS since December 22, 2017." (*Id.* ¶¶ 47–48.) WPCSD ultimately terminated Plaintiff on April 19, 2017. (*Id.* ¶ 49.)

Plaintiff alleges that Defendants have "caused or aggravated various types of injuries to Plaintiff and forced him to remain under doctors' care," where he is "receiving treatment for the injuries on the job caused or aggravated by the actions of Defendants." (*Id.* ¶ 51.) According to Plaintiff, WPCSD has not compensated Plaintiff according to Article XXIV of the CBA, which requires:

> Whenever a teacher is absent from his/her employment and unable to perform his/her duties because of a personal injury resulting from a causal relationship that

would be compensable under the workers compensation laws from an accident or an assault (not caused by his/her own contributory negligence) occurring in the discharge of his/her duties within the scope of his/her employment, he/she will be paid his/her full salary during his/her absence from his/her employment up to a period of two (2) years (less the amount of any worker's compensation award made for temporary disability due to said injury, if any, and any income which he/she is able to earn in lieu of and because he/she does not have to perform his/her teaching duties) and no part of such absence will be charged to his/her annual or accumulated sick leave.

(*Id.* ¶ 52 (quotation marks omitted).)  Plaintiff further alleges that during his employment, WPCSD did not have an "appointed compliance officer to address discrimination and harassment complaints."  (*Id.* ¶ 53.)  Plaintiff filed charges of discrimination and retaliation with the United States Equal Employment Opportunity Commission (the "EEOC") and received a Notice of Right to Sue "on or about" March 14, 2018.  (*Id.* ¶ 3.)

 B.  Procedural Background

  Because the procedural background of this Action has been summarized in the Court's previous Opinion & Order on the Motions To Dismiss the Second Amended Complaint ("SAC") brought by Union Defendants and State Defendants (the "2019 Opinion"), the Court supplements the procedural history of the case since the issuance of the 2019 Opinion below.[3]

  On July 16, 2019, the Court issued the 2019 Opinion, which granted the Union Defendants' Motion To Dismiss the SAC, and granted in part and denied in part the White Plains Defendants' Motion To Dismiss the SAC.  (*See generally* 2019 Op.)  The Court dismissed all but Plaintiff's procedural due process claim based on his termination without a prior hearing, and gave Plaintiff 30 days to file a third amended complaint.  (*Id.* at 44.)  In a letter filed under seal

---

  [3] The "Union Defendants" included the WPTA, the New York State United Teachers, Broderick, Hughes, and Carol Ann Tito.  (*See* Op. and Order ("2019 Op.") 1 (Dkt. No. 58).)  The "White Plains Defendants" included WPCSD, Smith, Reynolds, Doherty, Orcutt, Doty, Hirsch, Wolstencroft, Dougherty, and Friedman.  (*Id.* at 1–2.)

on August 13, 2019, Plaintiff requested a two-month extension to amend his complaint.  (Dkt. No. 61.)  The Court denied this request, absent additional detail on why the extension was necessary.  (*Id.*)  On August 26, 2019, Plaintiff filed a letter explaining that he requested a two-month extension to find legal representation due to his "suffering from a chronic[] very serious illness."  (Dkt. No. 64.)  Plaintiff represented that his doctor had advised him "not to engage in preparing legal briefs," because "recalling the events triggers severe anxiety and panic attacks." (*Id.*)  The Court granted the request for an extension, directing Plaintiff to file a third amended complaint by October 26, 2019.  (Dkt. No. 65.)

On October 25, 2019, Plaintiff filed his TAC.  (*See generally* TAC.)  On November 11, 2019, Defendants sought to file a motion to dismiss the TAC, (Dkt. No. 67), and the Court set a briefing schedule, (Dkt. No. 68).  On December 19, 2019, Defendants filed the instant Motion. (Not. of Mot.; Defs.' Mem. of Law in Supp. of Mot. ("Defs.' Mem.") (Dkt. No. 70); Decl. of Gerald S. Smith, Esq. in Supp. of Mot. ("Smith Decl.") (Dkt. No. 71).)  On January 6 and January 8, 2020, Plaintiff filed letters requesting an extension until March 23, 2020 for his response to the Motion, due to "car accident injuries [incurred] on December 9, 2019, and sufferings from a severe chronic[] illness."  (Dkt. Nos. 73–74.)  Plaintiff attached supporting documentation, but given that one of the attached documents was a doctor's note stating that Plaintiff was unable to work until January 5, 2020, (*id.*), the Court denied Plaintiff's request for a two-month extension and instead granted a 30-day extension, until February 13, 2020, (Dkt. No. 75).  On February 10 and 11, 2020, Plaintiff filed a request for another extension until April 13, 2020, due to "car accident injuries."  (Dkt. Nos. 76–77.)  The Court again found that the supporting documentation did not justify a two-month extension, and instead extended Plaintiff's deadline to March 13, 2020, stating that "[t]here w[ould] be no more extensions."  (Dkt. No. 78.)

Plaintiff did not file a response by this deadline, and on March 16, 2020, he requested an extension until July 3, 2020, again citing his "car accident injuries." (Dkt. No. 79.) The Court denied Plaintiff's request, finding that the submitted documentation did not support it, and provided Plaintiff with a due date of April 20, 2020. (Dkt. No. 80.) The Court again noted that there would be "[n]o more extensions." (*Id.*)

However, on May 29, 2020, Plaintiff asked for an extension until July 3, 2020, claiming that he had "still [not] recovered from the [December] car accident injuries," was "still under [the] treatment of two [d]octors and a [p]hysiotherapist," was "jobless" and thus unable to afford "expensive legal search programs," and was unable to leave his home to go to a law library because of the "statewide lockdown" due to the COVID-19 pandemic. (Dkt. No. 81.) The Court explained that the attached documentation again did not support Plaintiff's request and that if Plaintiff did not submit a response by June 30, 2020, the Court would deem the Motion fully submitted. (Dkt. No. 82.) Despite these instructions, in a letter sent via e-mail on June 30, 2020 and docketed by the Court on July 1, 2020, Plaintiff requested "possibly [his] last extension," until July 31, 2020. (Dkt. No. 84.) Plaintiff alleged that the stress in "attempt[ing] to meet the Court's June 30, 2020 deadline . . . made his health issues worse than before." (*Id.*) The Court denied this request, noting that the documentation Plaintiff submitted did not justify his inability to file a response over the course of several months, and deemed the Motion fully submitted. (Dkt. No. 84.)[4]

---

[4] This is not the first series of health-based extension requests filed by Plaintiff. (*See* Dkt. Nos. 57 (denying Plaintiff's December 2018 motion for a stay and appointment of pro bono counsel because the medical information provided by Plaintiff did not justify the request), 61 (denying Plaintiff's August 2019 request for a two-month extension to file an amended complaint absent additional detail on why the extension was necessary), 65 (granting Plaintiff's August 2019 request for a two-month extension to file an amended complaint "one last time," based on a doctor's report provided by Plaintiff).) Further, as the Court noted in its Order of July

On July 13, 2020, Plaintiff requested a stay in this proceeding to allow Plaintiff to "recover[] from illness and injuries" or, in the alternative, to appoint pro bono counsel on his behalf to respond to the Motion.  (Dkt. No. 85.)  The Court denied both requests in an Order dated July 14, 2020.  (Dkt. No. 86.)  On July 17, 2020, Plaintiff sent a letter to the Court "request[ing] that [the] Court . . . not dismiss this case until . . . Plaintiff recovers from illness and injuries . . . or in the alternative, finds a counsel to prosecute this case."  (Dkt. No. 88.)  The Court reiterated that it had deemed the Motion fully submitted on July 1, 2020 and had previously denied Plaintiff's request for a stay or for appointment of counsel.  (*Id.*)  The Court noted that the records attached to Plaintiff's July 17 letter "d[id] not alter the Court's conclusion."  (*Id.*)

## II.  Discussion

### A.  Standard of Review

The Supreme Court has held that although a complaint "does not need detailed factual allegations" to survive a motion to dismiss, "a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (alteration and quotation marks omitted).  Indeed, Rule 8 of the Federal Rules of Civil Procedure

---

14, 2020, Plaintiff has also requested several extensions and stays in other cases in both the Southern and Eastern Districts of New York over the course of the last year and a half.  (*See* Dkt. Nos. 47, 51, 52, 67, *Ahmad v. N.Y.C. Dept. of Educ.*, Case No. 18-CV-3494 (E.D.N.Y.) (letters from Plaintiff beginning in August 2019 seeking an extension on his opposition to a motion to dismiss due to "severe chronic[] illness" and "car accident injuries").)  *See also Ahmad v. E. Ramapo Cent. Sch. Dist.*, No. 09-CV-1440, 2018 WL 3222543, at *1 (S.D.N.Y. July 2, 2018), *filing appeal*, No. 18-2317 (2d Cir.) (denying Plaintiff's January 25, 2018 motion to stay the proceedings due to "serious chronic personal illness," because "Plaintiff's condition ha[d] not prevented him from filing this and another lengthy motion" (record citations and quotation marks omitted)).

"demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quotation marks omitted). "Nor does a complaint suffice if it tenders naked assertions devoid of further factual enhancement." *Id.* (alteration and quotation marks omitted). Instead, a complaint's "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555.

Although "once a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint," *id.* at 563, and a plaintiff must allege "only enough facts to state a claim to relief that is plausible on its face," *id.* at 570, if a plaintiff has not "nudged [his or her] claims across the line from conceivable to plausible, the[] complaint must be dismissed," *id.*; *see also Iqbal*, 556 U.S. at 679 ("Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense. But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" (citation omitted) (second alteration in original) (quoting Fed. R. Civ. P. 8(a)(2))); *id.* at 678–79 ("Rule 8 marks a notable and generous departure from the hypertechnical, code-pleading regime of a prior era, but it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions.").

In considering Defendants' Motion, the Court is required to "accept as true all of the factual allegations contained in the [TAC]." *Erickson v. Pardus*, 551 U.S. 89, 94 (2007); *see also Nielsen v. Rabin*, 746 F.3d 58, 62 (2d Cir. 2014) (same). And, the Court must "draw[] all reasonable inferences in favor of the plaintiff." *Daniel v. T & M Prot. Res., Inc.*, 992 F. Supp. 2d 302, 304 n.1 (S.D.N.Y. 2014) (citing *Koch v. Christie's Intern. PLC*, 699 F.3d 141, 145 (2d Cir.

2012)).  Where, as here, a plaintiff proceeds pro se, the Court must "construe[ ] [the complaint] liberally and interpret[ ] [it] to raise the strongest arguments that [it] suggest[s]."  *Sykes v. Bank of Am.*, 723 F.3d 399, 403 (2d Cir. 2013) (per curiam) (quotation marks omitted).  However, "the liberal treatment afforded to pro se litigants does not exempt a pro se party from compliance with relevant rules of procedural and substantive law."  *Bell v. Jendell*, 980 F. Supp. 2d 555, 559 (S.D.N.Y. 2013) (citation and quotation marks omitted).

Generally, "[i]n adjudicating a Rule 12(b)(6) motion, a district court must confine its consideration to facts stated on the face of the complaint, in documents appended to the complaint or incorporated in the complaint by reference, and to matters of which judicial notice may be taken."  *Leonard F. v. Isr. Disc. Bank of N.Y.*, 199 F.3d 99, 107 (2d Cir. 1999) (citation and quotation marks omitted).  However, when the complaint is pro se, the Court may consider "materials outside the complaint to the extent that they are consistent with the allegations in the complaint," *Alsaifullah v. Furco*, No. 12-CV-2907, 2013 WL 3972514, at *4 n.3 (S.D.N.Y. Aug. 2, 2013) (citation and quotation marks omitted), including, "documents that a pro se litigant attaches to his opposition papers," *Agu v. Rhea*, No. 09-CV-4732, 2010 WL 5186839, at *4 n.6 (E.D.N.Y. Dec. 15, 2010) (italics omitted), and "documents that the plaintiff[ ] either possessed or knew about and upon which [he or she] relied in bringing the suit," *Rothman v. Gregor*, 220 F.3d 81, 88 (2d Cir. 2000) (citation omitted).

B. Analysis

Defendants argue that Plaintiff fails to state claims under Title VII, 42 U.S.C. §§ 1983

and 1985, and the Fourteenth Amendment.  (*See generally* Defs.' Mem.)  Defendants also argue

that Plaintiff fails to state a claim based on alleged violations of the CBA.  (*See id.* at 12.)[5]

1. Title VII

Plaintiff alleges that Defendants engaged in various acts of retaliation against him for his

pending discrimination lawsuit against ERCSD, and the TAC could be construed as alleging that

Plaintiff was retaliated against for "his complaints of discrimination, harassment, [and] hostile

and unsafe work environment."  (*See* TAC ¶¶ 13–14, 17, 21, 41, 54.)  Defendants argue that

Plaintiff fails to "raise an inference of retaliation," because his claim is "based upon the stray

remarks of non-decisionmakers"; the TAC does not plead facts suggesting a but-for connection

between the adverse action and the protected activity; and the TAC "acknowledges that

Plaintiff's employment was terminated due to the [a] legitimate, non-retaliatory reason."  (Defs.'

Mem. 4–6.)  Defendants also argue that Plaintiff improperly brings Title VII claims against

individual Defendants Smith and Doherty.  (*Id.* at 4.)

It is well-established that individual defendants cannot be held liable under Title VII.  *See*

*Davis Bell v. Columbia Univ.*, 851 F. Supp. 2d 650, 687 (S.D.N.Y. 2012) ("It is well settled that

---

[5] Although not attached to the TAC, Plaintiff asserts a claim based on breach of the CBA
and quotes specific provisions of the CBA in crafting his claim.  (*See* TAC ¶¶ 29, 32, 52, 67–68.)
The CBA is therefore incorporated by reference, and the Court will consider it in deciding
Defendants' Motion.  *See Hutson v. Notorious B.I.G., LLC*, No. 14-CV-2307, 2015 WL
9450623, at *3 (S.D.N.Y. Dec. 22, 2015) (considering a contract not attached to the complaint in
copyright ownership dispute "because it is incorporated by reference" (citation omitted));
*Onanuga v. Pfizer, Inc.*, No. 03-CV-5405, 2003 WL 22670842, at *4 (S.D.N.Y. Nov. 7,
2003) (holding that the court could consider a contract provided by the defendants but not
attached to the complaint "because this contract was referenced in and relied upon in the drafting
the [c]omplaint, and forms the basis for the [breach of contract] allegations" (citation omitted)).

there is no individual liability under Title VII." (citing *Lore v. City of Syracuse*, 670 F.3d 127, 169 (2d Cir. 2012)); *see also Patterson v. County of Oneida*, 375 F.3d 206, 221 (2d Cir. 2004) (noting that "individuals are not subject to liability under Title VII," including "individual defendants with supervisory control over a plaintiff" (citations and quotation marks omitted)). Accordingly, to the extent Plaintiff intends to bring retaliation claims against Smith and Dougherty under Title VII in his TAC, these claims are dismissed with prejudice.

Title VII's anti-retaliation provision prohibits an employer from "discriminat[ing] against any of his employees . . . because [the employee] has opposed any practice made an unlawful employment practice by this subchapter." 42 U.S.C. § 2000e-3(a). In other words, "Title VII forbids an employer to retaliate against an employee for . . . complaining of employment discrimination prohibited by Title VII." *Kessler v. Westchester Cty. Dep't of Soc. Servs.*, 461 F.3d 199, 205 (2d Cir. 2006). Courts analyze claims for retaliation pursuant to Title VII under the familiar framework set forth by the Supreme Court in *McDonnell Douglas*. *See Zann Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 843 (2d Cir. 2013) ("Federal and state law retaliation claims are reviewed under the burden-shifting approach of *McDonnell Douglas*." (citations omitted)). "Under the first step of the *McDonnell Douglas* framework, the plaintiff must establish a prima facie case of retaliation." *Id.* at 844 (citation omitted). Once the plaintiff has done so, "the burden shifts to the employer to articulate some legitimate, non-retaliatory reason for the employment action." *Id.* at 845 (citation omitted). "The employee at all times bears the burden of persuasion to show retaliatory motive." *Cox v. Onondaga Cty. Sheriff's Dep't*, 760 F.3d 139, 145 (2d Cir. 2014).

To establish a prima facie case of retaliation, the plaintiff must show that: "(1) [ ]he was engaged in an activity protected under Title VII; (2) [his] employer was aware of [his]

participation in the protected activity; (3) the employer took adverse action against [him]; and (4) a causal connection existed between the protected activity and the adverse action." *Kwan*, 737 F.3d at 850 (citation omitted).  Accordingly, "for a retaliation claim to survive . . . a motion to dismiss, the plaintiff must plausibly allege that: (1) defendants discriminated—or took an adverse employment action—against him, (2) 'because' he has opposed any unlawful employment practice." *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 90 (2d Cir. 2015) (citation omitted).  "A plaintiff's burden at this prima facie stage is de minimis." *Treglia v. Town of Manlius*, 313 F.3d 713, 719 (2d Cir. 2002) (citation and italics omitted).  "The Supreme Court has held that in the context of a Title VII retaliation claim, an adverse employment action is any action that 'could well dissuade a reasonable worker from making or supporting a charge of discrimination.'" *Vega*, 801 F.3d at 90 (quoting *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 57 (2006)); *see also Hicks v. Baines*, 593 F.3d 159, 162 (2d Cir. 2010) ("[R]etaliation is unlawful when the retaliatory acts were harmful to the point that they could well dissuade a reasonable worker from making or supporting a charge of discrimination." (citation and quotation marks omitted)).

Protected activities are "action[s] taken to protest or oppose statutorily prohibited discrimination." *Soto v. Marist Coll.*, No. 17-CV-7976, 2019 WL 2371713, at *10 (S.D.N.Y. June 5, 2019) (citation and quotation marks omitted).  "The opposition must be directed at an unlawful employment practice of an employer," *Wimmer v. Suffolk Cty. Police Dep't*, 176 F.3d 125, 135 (2d Cir. 1999) (citation and quotation marks omitted), and "even an informal protest of discriminatory employment practices" will suffice, *Mejia v. White Plains Self Storage Corp.*, No. 18-CV-12189, 2020 WL 247995, at *6 (S.D.N.Y. Jan. 16, 2020) (emphasis, alteration, and

quotation marks omitted) (quoting *Sumner v. U.S. Postal Serv.*, 899 F.2d 203, 209 (2d Cir. 1990)).

Here, Plaintiff alleges that he lodged "complaints of discrimination, harassment, [and] hostile and unsafe work environment" that were never investigated.  (TAC ¶¶ 41, 54.)  Such activity is certainly protected under Title VII.  However, with respect to these complaints, Plaintiff has not cured the deficiencies identified by the Court in its 2019 Opinion.  (*See* 2019 Op. 24–26.)  As with the SAC, Plaintiff alleges that he complained to Reynolds about discriminatory treatment but that no investigation was ever performed.  (TAC ¶¶ 41, 54.) "However, he pleads no facts that could support an inference that he was terminated in response to those complaints."  (2019 Op. 25.)  And, to the extent that Plaintiff intends to rely on temporal proximity between his complaints and his termination to demonstrate a causal connection, Plaintiff does not specify when the complaints were made, which "prevent[s] the Court from inferring retaliation based on temporal proximity alone."  (*Id.* at 26 (collecting cases).)  As such, the Court dismisses any retaliation claims Plaintiff intended to bring based on his workplace complaints.

However, Plaintiff has also alleged that he faced retaliation because of his discrimination lawsuit against ERCSD, which was pending at the time he was hired by WPCSD.  (TAC ¶¶ 12– 14, 17, 21.)  Although Defendants emphasize that Plaintiff's discrimination lawsuit related to "a completely different school district," (Defs.' Mem. 6 (citation and footnote omitted)), actions taken by an employer in response to a lawsuit against a third-party may well constitute retaliation, *see Ghirardelli v. McAvey Sales & Serv., Inc.*, 287 F. Supp. 2d 379, 387 (S.D.N.Y. 2003) (determining that the plaintiff established a prima facie case of unlawful retaliation by her employer based on a Title VII lawsuit that the plaintiff had filed against a different employer),

*aff'd*, 98 F. App'x 909 (2d Cir. 2004); *see also Lewis v. Hanson*, No. 18-CV-12, 2020 WL 1812556, at *13 (N.D.N.Y. Apr. 9, 2020) (noting, in the context of a retaliation claim under 42 U.S.C. § 1983, that "courts in th[e] [Second] Circuit have declined to dismiss retaliation claims on the basis that the underlying protected activity was directed towards a third party" (record citation and quotation marks omitted)).  Thus, the Court considers Plaintiff's retaliation claims in the context of his lawsuit against ERCSD.

Plaintiff alleges in the TAC that various WPCSD and WPHS employees took numerous retaliatory actions against him.  Not all of these actions, however, constitute adverse actions. An employee experiences an adverse action when he endures a "materially adverse change" in the terms and conditions of employment.  *See Boyd v. Presbyterian Hosp. in N.Y.C.*, 160 F. Supp. 2d 522, 536 (S.D.N.Y. 2001) (citation and quotation marks omitted).  Such actions include "discharge, refusal to hire, refusal to promote, demotion, reduction in pay, and reprimand." *Treglia*, 313 F.3d at 720 (citation and quotation marks omitted).  As the general intent of Title VII is to protect individuals from actions injurious to current employment or the ability to secure future employment, *Wanamaker v. Columbian Rope Co.*, 108 F.3d 462, 466 (2d Cir. 1997) (citation omitted), the Second Circuit has stated that adverse employment actions are not limited to "pecuniary emoluments" but may include lesser actions such as negative employment evaluation letters, *Treglia*, 313 F.3d at 720 (citation and quotation marks omitted); *see also Lovejoy-Wilson v. NOCO Motor Fuel, Inc.*, 263 F.3d 208, 223–24 (2d Cir. 2001) (same).

First, Plaintiff alleges that "[i]n retaliation [for] . . . Plaintiff's discrimination lawsuit against [ERCSD], the Jewish employees of WPCSD retaliated against Plaintiff and started to remove lab equipment from Plaintiff's classroom to intentionally create a hardship on Plaintiff and to make [him] fail due to unequal access to the lab equipment."  (TAC ¶ 13.)  However, this

conduct "fail[s] to satisfy the threshold for [an] adverse employment action," *Ward v. Shaddock*,

No. 14-CV-7660, 2016 WL 4371752, at *6 n.4 (S.D.N.Y. Aug. 11, 2016) (collecting cases),

given that Plaintiff does not allege that the removal of this equipment from his classroom

resulted in a "materially adverse change" in the terms or conditions of his employment, *Boyd*,

160 F. Supp. 2d at 536.  *See Murphy v. Suffolk Cty. Cmty. Coll.*, No. 10-CV-251, 2011 WL

5976082, at *6 (E.D.N.Y. Nov. 29, 2011) (explaining that the "denial of . . . safety equipment,"

on its own, is likely insufficient to constitute an adverse employment action); *see also Avillan v.

Donahue*, 483 F. App'x 637, 638 (2d Cir. 2012) (concluding that "having personal items

removed from a locker" does not constitute a materially adverse action).

Second, Plaintiff alleges that "[i]n retaliation of Plaintiff's discrimination lawsuit against

[ERCSD], the Jewish employees of WPCSD, upon information and belief . . . coached and

manipulated students on the basis of race, religion[,] and national origin, against Plaintiff and

encouraged them to create problems for Plaintiff."  (TAC ¶ 17.)  Plaintiff alleges that this effort

involved a number of WPCSD employees, including Doherty, Doty, Hirsch, Wolstencroft,

Dougherty, Friedman, and Broderick.  (*Id.*)  More specifically, Plaintiff alleges that Hirsch and

Dougherty coached "S.R.," a student, to make a number of false allegations against Plaintiff

regarding the quality of his teaching.  (*Id.* ¶¶ 20–22.)  However, "false allegations, alone, may

not constitute an adverse employment action."  *Alvarado v. Mount Pleasant Cottage Sch. Dist.*,

404 F. Supp. 3d 763, 784 (S.D.N.Y. 2019) (citation omitted); *see also Spaulding v. N.Y.C. Dep't

of Educ.*, No. 12-CV-3041, 2015 WL 12645530, at *38 (E.D.N.Y. Feb. 19, 2015) ("A false

accusation, absent a change in the terms and conditions of employment, is not sufficient to state

an adverse employment action." (collecting cases)), *adopted by* 2015 WL 5560286 (E.D.N.Y.

Sept. 2015).  Here, Plaintiff has not alleged that S.R.'s accusations "directly resulted in a change

in the terms and conditions of h[is] employment," *Alvarado*, 404 F. Supp. 3d at 784 (record

citation omitted).  Moreover, Plaintiff does not allege that O.A.'s conduct, which does appear to

have played a role in his termination, was the result of any "coaching" by WPCSD employees.

(*See* TAC ¶¶ 25–28, 50.)  Plaintiff also does not support his general claim that other WPCSD

employees may have "coached and manipulated [other] students . . . and encouraged them to

create problems for Plaintiff," with specific allegations of these occurrences.  (*See id.* ¶ 17.)  It is

therefore unlikely that, standing alone, the false allegations lodged against Plaintiff by students

and alleged "coaching" of students to cause issues for Plaintiff constitute adverse actions.

Third, Plaintiff alleges that there were several changes to his position.  Specifically,

Plaintiff claims that after the cell phone incident with O.A., (*id.* ¶¶ 25–27), Doherty informed

Plaintiff that his new assignment was the "science teachers' work area," and instructed him not

to interact with O.A., (*id.* ¶ 28).  Plaintiff also alleges that as of December 23, 2016, he was no

longer allowed to enter WPCSD property or communicate with staff members, students, or

parents, (*id.* ¶ 42); that on February 13, 2017, Smith recommended that the School Board

"retroactively convert Plaintiff's leave-replacement appointment to a probationary appointment,"

which was approved, (*id.* ¶ 46); and that on April 19, 2017, he was ultimately terminated, (*id.*

¶ 49).  Such actions are sufficient to constitute adverse actions, particularly when Plaintiff was

consistently informed from December 2016 through February 2017 that he would be terminated.

(*Id.* ¶¶ 19, 36, 45, 48.)  With respect to Plaintiff's reassignment to the science teachers' work

area and his converted status as a probationary employee, "[a] transfer of an employee to a new

location can qualify as an adverse employment action when it is a change in working conditions

more disruptive than a mere inconvenience or an alteration of job responsibilities."  *Feliciano v.

City of New York*, No. 14-CV-6751, 2015 WL 4393163, at *7 (S.D.N.Y. Jul. 15, 2015) (citation,

alteration, and quotation marks omitted); *see also Lore*, 670 F.3d at 170 ("The transfer of an employee from an 'elite' position to one that is 'less prestigious . . . with little opportunity for professional growth' is sufficient to permit a jury to infer that the transfer was a materially adverse employment action." (alteration in original) (quoting *Burlington N.*, 548 U.S. at 71); *Lopez v. S.B. Thomas*, 831 F.2d 1184, 1188 (2d Cir. 1987) (finding that a plaintiff's 90-day probationary period was an adverse action when his supervisor told him that he would be fired at the end of the period "regardless of his performance"); *Feliciano*, 2015 WL 4393163, at *7 (suggesting that a difference in "pay, responsibilities, [and] prestige" could constitute an adverse employment action); *Hubbard v. Port Auth. of N.Y. and N.Y.*, No. 05-CV-4396, 2008 WL 464694, at *12 (S.D.N.Y. Feb. 20, 2008) ("[R]eprimands, threats of disciplinary action[,] and excessive scrutiny do not constitute adverse employment actions in the absence of other negative results such as . . . being placed on probation." (citations and quotation marks omitted)).  The alleged prohibitions on Plaintiff's return to WPCSD property and contact with WPCSD staff members, students, and parents are similarly adverse.  *See Pediford-Aziz v. City of New York*, 170 F. Supp. 3d 480, 486 (E.D.N.Y. 2016) (finding an adverse action when the plaintiff was restored to a position after a suspension but "prevented from returning to work").  Thus, the Court considers whether Plaintiff has sufficiently alleged causation with respect to his termination on April 19, 2017 and earlier actions taken against him, such as his reassignment to the science teachers' work room on December 21, 2016, removal from WPHS on December 23, 2016, and his "retroactive[] conver[sion] . . . to a probationary appointment," (TAC ¶ 46), on February 13, 2017.

　　With respect to the causation element for a claim of retaliation, "a plaintiff must plausibly plead a connection between the act and his engagement in protected activity."  *Vega*, 801 F.3d at

90 (citation omitted).  A plaintiff can demonstrate the causal connection in one of two ways: "(1) indirectly, by showing that the protected activity was followed closely by discriminatory treatment, or through other circumstantial evidence such as disparate treatment of fellow employees who engaged in similar conduct; or (2) directly, through evidence of retaliatory animus directed against the plaintiff by the defendant."  *Gordon v. N.Y.C. Bd. of Educ.*, 232 F.3d 111, 117 (2d Cir. 2000) (citation omitted); *see also Rodriguez v. Town of Ramapo*, 412 F. Supp. 3d 412, 443 (S.D.N.Y. 2019) (same).

Here, Plaintiff does not allege any facts to directly suggest that his filing of the lawsuit against ERCSD motivated his termination or placement on a probationary period.  For example, he does not allege that "negative comments by supervisors" were made about this lawsuit, *Gelin v. Geithner*, No. 06-CV-10176, 2009 WL 804144, at *22 (S.D.N.Y. Mar. 26, 2009) (citation and quotation marks omitted), *aff'd*, 376 F. App'x 127 (2d Cir. 2010), nor does he allege "an admission by the decisionmaker that he . . . made a decision by relying on an improper consideration," *Farmer v. Shake Shack Enters., LLC*, No. 19-CV-9425, 2020 WL 4194860, at *13 (S.D.N.Y. July 21, 2020) (citation and quotation marks omitted).  (*See generally* TAC.)  Indeed, the only alleged direct comments related to Plaintiff's lawsuit were made by Wolstencroft, (*id.* ¶ 14), who does not appear to have been involved in the decision to terminate Plaintiff, and Orcutt, whose alleged comment to several employees that Plaintiff "was terminated from Ramapo High School and had [an] ongoing discrimination lawsuit against [ERCSD]," (*id.* ¶ 12), does not, without more, amount to anything more than a factual statement about Plaintiff's pending litigation.  *Cf. Emmanuel v. Cushman & Wakefield, Inc.*, No. 13-CV-2894, 2015 WL 5036970, at *4 (S.D.N.Y. Aug. 26, 2015) ("Direct evidence may . . . include evidence of *discriminatory statements or actions* by employees who, while not the ultimate decisionmakers,

have 'enormous influence in the decision-making process.'" (emphasis added) (citations omitted)).[6]  Thus, Plaintiff has not plausibly alleged a direct causal connection between his protected activity and the adverse actions.

Because Plaintiff has not alleged "disparate treatment of fellow employees who engaged in similar conduct," *Gordon*, 232 F.3d at 117, the Court next assesses whether he has adequately alleged temporal proximity.  Although the Second Circuit has not established a "bright line to define the outer limits beyond which a temporal relationship is too attenuated to establish a causal relationship between the exercise of a federal constitutional right and an allegedly retaliatory action," a court must "exercise its judgment about the permissible inferences that can be drawn from temporal proximity in the context of particular cases."  *Espinal v. Goord*, 558 F. 3d 119, 129 (2d Cir. 2009) (citations and quotation marks omitted).  A lengthy gap between the alleged protected activity and alleged adverse employment action can "suggest[ ], by itself, no causality at all."  *Clark Cty. Sch. Dist. v. Breeden*, 532 U.S. 268, 274 (2001).

Plaintiff alleges that when he was hired, his discrimination lawsuit against ERCSD was pending in federal court.  (TAC ¶ 12.)  This case appears to have still been pending at the time of Plaintiff's termination, as well as the actions taken with respect to his employment in December 2016 and February 2017.  (*See generally* Dkt., *Mushtaq Ahmad v. E. Ramapo Cent. Sch. Dist.*, Case No. 14-4001 (2d Cir.).)[7]  "Where, as here, the alleged adverse action occurred in response

---

[6] Although Plaintiff does allege that Wolstencroft told Plaintiff that he knew "everything" about the pending lawsuit against ERCSD, (TAC ¶ 14), Plaintiff does not allege that Wolstencroft wielded "enormous influence in the decisionmaking process," or that he was involved in the process at all.  *Rose v. N.Y.C. Bd. of Educ.*, 257 F.3d 156, 162 (2d Cir. 2001) (citation omitted).  Plaintiff alleges merely that Wolstencroft "work[ed] under the principal," (TAC ¶ 16), which is presumably true for any employee at WPHS.

[7] The Court properly takes judicial notice of Plaintiff's other action.  *See Edwards v. Montgomery*, No. 19-CV-923, 2019 WL 4805380, at *2 n.2, 5 n.5 (N.D.N.Y. Oct. 1, 2019)

to ongoing litigation, there is adequate temporal proximity to find causation." *Lewis*, 2020 WL 1812556, at *13 (finding that because the plaintiff filed a lawsuit in June 2015 that remained pending when the alleged adverse actions took place in April 2016, the plaintiff had sufficiently established an indirect causal connection) (citation and quotation marks omitted); *see also Chidhume v. Greenburgh-N. Castle Union Free Sch. Dist.*, No. 18-CV-1790, 2020 WL 2131771, at *12 (S.D.N.Y. May 4, 2020) (determining that because the alleged adverse action occurred in response to a pending EEOC charge and the litigation itself, there was adequate temporal proximity); *Pediford-Aziz*, 170 F. Supp. 3d at 486 (finding, in the context of an action under the Americans with Disabilities Act, that the plaintiff was engaged in protected activity until she settled a pending lawsuit); *Cruz v. Lee*, No. 14-CV-4870, 2016 WL 1060330, at *7 (S.D.N.Y. Mar. 15, 2016) (holding that the plaintiff adequately alleged a causal connection when a separate lawsuit was "pending—and the protected activity was therefore ongoing—when the alleged adverse action occurred," even when the lawsuit at issue did not involve the defendants or any of the staff at the plaintiff's place of work).

Further, "the fact that one of the persons responsible for Plaintiff's termination knew of the protected activity provides . . . sufficient evidence to find that Plaintiff's [lawsuit] was a proximate cause of his termination [and other alleged adverse actions taken against him]." *Leshinsky v. Telvent GIT, S.A.*, 942 F. Supp. 2d 432, 450 (S.D.N.Y. 2013); *see also Kim v. Columbia Univ.*, 460 F. App'x 23, 25 (2d Cir. 2012) ("Although temporal proximity between a protected activity and adverse action may be sufficient to satisfy the causality element of a prima facie retaliation claim, this period is measured from the date of the 'employer's knowledge of

(taking judicial notice of the plaintiff's other pending actions filed in the same district); *Jeanty v. McClane Eastern Inc.*, No. 17-CV-6366, 2018 WL 1406625, at *4 (S.D.N.Y. Mar. 20, 2018) (taking judicial notice of three other cases filed by the plaintiff).

[the] protected activity.'" (italics omitted) (quoting *Clark Cty. Sch. Dist.*, 532 U.S. at 273));

*Massie v. Metro. Museum of Art*, No. 06-CV-12905, 2010 WL 3749206, at *14 (S.D.N.Y. Aug.

17, 2010) (noting that "as the period between the protected activity and allegedly retaliatory

action increases, the probative value of the temporal proximity decreases and other factors—such

as evidence of the decision-makers' knowledge of the protected activity—become more

relevant" (citation and footnote omitted)).  Although such allegations are sparse, Plaintiff does

claim that at least one person involved in his termination, Broderick, knew of the pending

lawsuit.  (*See* TAC ¶¶ 12, 30, 35–36.)  *See Cruz*, 2016 WL 1060330, at *7 (finding that the

"temporal proximity" paired with, inter alia, the "[d]efendants' knowledge of [a pending lawsuit]

. . . sufficiently establish[ed] a causal connection").

Further, the TAC alleges that Broderick and others at WPCSD learned of the lawsuit

"after Plaintiff's hiring," which was presumably after Plaintiff's interview on August 25, 2016.

(TAC ¶¶ 9, 12.)  Thus, construed liberally, there was a span of at most four months between his

employer's knowledge of the pending lawsuit and the date Plaintiff was moved to the science

teachers' workroom and then prohibited from returning to school premises, (*id.* ¶¶ 28, 42); six

months between his employer's knowledge of the pending lawsuit and Plaintiff's retroactive

conversion to probationary employee status, (*id.* ¶ 46); and eight months between his employer's

knowledge of the pending lawsuit and Plaintiff's termination, (*id.* ¶ 49).  Moreover, given

Smith's proclamations over the course of several months that he was seeking Plaintiff's

termination, it is possible that Plaintiff was terminated at the earliest opportunity.  *See Pediford-

Aziz*, 170 F. Supp. 3d at 486 (finding a span of eight months between the time the plaintiff settled

a lawsuit and the time she was prevented from coming to work was sufficient to establish

temporal proximity when defendants had "no [other] opportunity to retaliate"); *Cronin v. St.*

*Lawrence*, No. 08-CV-6346, 2009 WL 2391861, at *5 (S.D.N.Y. Aug. 5, 2009) (determining

that an eleven-month gap is acceptable if the defendant "had no earlier opportunity to retaliate"

(footnote omitted) (collecting cases)). Thus, drawing all reasonable inferences in Plaintiff's

favor, and construing the TAC liberally, the Court finds that Plaintiff has sufficiently alleged a

causal connection at this early stage. *See Lindner v. Int'l Bus. Machs. Corp.*, No. 06-CV-4751,

2008 WL 2461934, at *7 (S.D.N.Y. June 18, 2008) (noting that "retaliation claims are rarely

dismissed pursuant to Rule 12(b)(6) where the plaintiff has alleged a time period of less than one

year between the protected activity and the alleged retaliatory conduct"); *Lee v. Overseas*, No.

00-CV-9682, 2001 WL 849747, at *6 (S.D.N.Y. July 30, 2001) (noting that "the standard is

liberal at the pleading phase," and, although the defendants cited cases dismissing retaliation

claims where intervals in time were shorter than the one at issue, "th[o]se dismissals were at the

summary judgment stage" (collecting cases)).[8]

### 2. 42 U.S.C. § 1985(3)

Plaintiff alleges that Defendants "reached a meeting of the minds, intentionally conspired

and colluded[] against Plaintiff[,] and intentionally created a hostile work environment in the

terms, conditions, and privileges of employment in violation of 42 U.S.C. § 1985." (TAC ¶ 62.)

To establish a conspiracy claim under 42 U.S.C. § 1985(3), a plaintiff must allege: "(1) a

conspiracy; (2) for the purpose of depriving, either directly or indirectly, any person or class of

---

[8] It is unclear whether Plaintiff also seeks to bring discrimination and hostile work
environment claims under Title VII. (*Compare* TAC ¶¶ 59–60 (claiming, with respect to
Plaintiff's Title VII claim, that Defendants "took adverse action against [Plaintiff]" in connection
with his "discrimination lawsuit against ERCSD" and "retaliated against . . . [P]laintiff . . . on
account of his opposition to race, national origin, and religious discrimination") *with id.* ¶ 55
(noting that "the circumstances support an inference of discrimination on the basis of Plaintiff's
membership in a protected class"). However, because Defendants do not address whether
Plaintiff has stated a claim for discrimination or hostile work environment in connection with
this Motion, (*see generally* Defs.' Mem.), the Court does not discuss any potential claims herein.

persons of equal protection of the laws; (3) an act in furtherance of the conspiracy; (4) whereby a person is deprived of any right of a citizen of the United States." *Brown v. City of Oneonta, N.Y.*, 221 F.3d 329, 341 (2d Cir. 1999) (citation, alterations, and quotation marks omitted). Moreover, "to reach a purely private conspiracy under [§ 1985(3)], a plaintiff must [also] show . . . that the conspiracy aimed at interfering with rights that are protected against private, as well as official, encroachment." *Poles v. Brooklyn Cmty. Hous. & Servs.*, No. 10-CV-1733, 2010 WL 1992544, at *2 (E.D.N.Y. May 14, 2010) (emphasis in original) (quotation marks omitted) (quoting *Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263, 268 (1993)).  To state such a claim, a plaintiff must also make "a showing of class-based invidiously discriminatory animus" on the part of the conspiring parties, *Hickey v. City of New York*, No. 01-CV-6506, 2004 WL 2724079, at *22 (S.D.N.Y. Nov. 29, 2004) (citations omitted), *aff'd*, 173 F. App'x 893 (2d Cir. 2006), as well as provide "some factual basis supporting a meeting of the minds, such that [the] defendants entered into an agreement, express or tacit, to achieve the unlawful end," *Webb v. Goord*, 340 F.3d 105, 110 (2d Cir. 2003) (citation and quotation marks omitted).  The Second Circuit has "defined 'class-based animus' to include discrimination based on religion." *Jews for Jesus, Inc. v. Jewish Cmty. Relations Council of N.Y., Inc.*, 968 F.2d 286, 291 (2d Cir. 1992) (collecting cases).  "Claims of conspiracy that are vague and provide no basis in fact must be dismissed." *Germain v. M & T Bank Corp.*, 111 F. Supp. 3d 506, 540 (S.D.N.Y. 2015) (citation, alteration, and quotation marks omitted).

To satisfy the first element of his claim, Plaintiff must allege "a meeting of the minds, such that . . . [D]efendants entered into an agreement, express or tacit, to achieve the unlawful end." *Williams v. Long Beach Mortg. Co.*, No. 15-CV-5952, 2016 WL 5720810, at *7 (S.D.N.Y. Sept. 30, 2016) (citation and quotation marks omitted), *aff'd*, 702 F. App'x 92 (2d Cir. 2018).

The only allegation in the TAC that could plausibly suggest a "meeting of the minds," as required under 1985(3), is Plaintiff's claim that Smith, Doherty, and Broderick met on December 21, 2016 to "conspire[], collude[,] and plan[] Plaintiff's termination."  (TAC ¶ 30.)[9]  However, even construing the TAC liberally, Plaintiff fails to establish that any of these Defendants acted with "class-based invidiously discriminatory animus" under § 1985(3).  The only allegation of discriminatory animus with respect to Plaintiff's termination process is that a police officer stood guard outside of the room where Plaintiff was "detained," "on the basis of Plaintiff's race and religion."  (*Id.* ¶ 34.)  However, beyond this conclusory statement, Plaintiff makes no "*fact-specific* allegations of a causal link between . . . [D]efendant[s'] actions and . . . [P]laintiff's [race, religion, or national origin]."  *Grimes v. Fremont Gen. Corp.*, 785 F. Supp. 2d 269, 296 (S.D.N.Y. 2011) (emphasis added) (citation, alteration, and quotation marks omitted); *see also Chadha v. Conn. Med. Examining Bd.*, No. 99-CV-874, 1999 WL 1067805, at *4 (D. Conn. Oct. 29, 1999) (noting that when the reason asserted for the deprivation of rights was retaliation, and not discriminatory animus, the claim was "simply not covered by the statute[] under which [the plaintiff] br[ought] his conspiracy claim"); *Johnson v. Andlinger & Co., Inc.*, No. 94-CV-43, 1998 WL 229913, at *2 (D. Conn. Mar. 30, 1998) (indicating that the plaintiff's status as an "alleged victim of retaliation" would not "establish that the plaintiff belongs to a class of persons

---

[9] Any other conceivable allegations of "meetings of the minds" fall short, particularly because those allegations involve individuals who have previously been dismissed from this Action, and against whom Plaintiff has not asserted amended claims.  (*See* TAC ¶¶ 12 (alleging that after Plaintiff's hiring, Orcutt informed Wolstencroft, Broderick, Dougherty, and Friedman that Plaintiff had an "ongoing discrimination lawsuit" against ERCSD), 17 (stating that "the Jewish employees" of WPCSD, including Doherty, Doty, Hirsch, Wolstencroft, Dougherty, Friedman, and Broderick, "coached and manipulated students . . . against Plaintiff"), 21 (alleging that Hirsch and Dougherty met with and coached a student to make false allegations against Plaintiff).)

entitled to protection under [§] 1985(3)"); *cf. Zhang Jingrong v. Chinese Anti-Cult World All.*,
287 F. Supp. 3d 290, 299 (E.D.N.Y. 2018) (finding that the plaintiffs sufficiently alleged
discriminatory animus when the complaint detailed, inter alia, verbal attacks and written
materials threatening "eradication" and "violent suppression" of the plaintiffs' religious group
(record citations and quotation marks omitted)); *Germain*, 111 F. Supp. 3d at 517, 541
(dismissing a claim under § 1985(3) on other grounds, but noting that discriminatory animus was
properly pled when the defendant corporation's employees had, inter alia, "express[ed] anti-
Muslim sentiment").  Here, the only allegations of discriminatory comments are those made by
Wolstencroft, who Plaintiff does not allege was involved in his termination in any way.  (*See*
TAC ¶¶ 14–16.)

Moreover, even if Plaintiff had sufficiently alleged discriminatory animus on the part of
Smith, Doherty, and Broderick, his claims would likely be barred by the intracorporate immunity
doctrine.  (*See* Defs.' Mem. 8–9.)  Under this doctrine, "officers, agents[,] and employees of a
single corporate entity are legally incapable of conspiring together."  *Chamberlain v. City of
White Plains*, 986 F. Supp. 2d 363, 388 (S.D.N.Y. 2013) (quotation marks omitted) (quoting
*Hartline v. Gallo*, 546 F.3d 95, 99 n.3 (2d Cir. 2008)).  Smith and Doherty, as well as Broderick,
are all employees of WPCSD, and Plaintiff makes no allegations suggesting that these
individuals were "pursuing personal interests wholly separate and apart from the entity,"
*Castanza v. Town of Brookhaven*, 700 F. Supp. 2d 277, 292 (E.D.N.Y. 2010), which would be an
"exception to the intracorporate conspiracy doctrine," *Salgado v. City of New York*, No. 00-CV-
3667, 2001 WL 290051, at *8 (S.D.N.Y. Mar. 26, 2001) ("There is a 'personal interest' or
'personal stake' exception to the intracorporate conspiracy doctrine, . . . which permits a § 1985
claim where there are individuals who are 'motivated by an independent personal stake in

achieving the corporation's objective.'" (quoting *Girard v. 94th St. & Fifth Ave. Corp.*, 530 F.2d 66, 72 (2d Cir. 1976))).[10]   In order for this exception to apply, "the plaintiff must . . . allege that [the defendants] acted other than in the normal course of their corporate duties."  *Harris v. City of Newburgh*, No. 16-CV-2731, 2017 WL 4334141, at *8 (Sept. 27, 2017) (quotation marks omitted) (quoting *Girard*, 530 F.2d at 72).  The TAC is devoid of any allegations that Defendants were motivated by an "independent personal stake" in Plaintiff's termination, *Salgado*, 2001 WL 290051, at *8, or that they acted "other than in the normal course of their corporate duties" in ultimately seeking his termination, *Harris*, 2017 WL 4334141, at *8.  (*See generally* TAC.)  Thus, even if Plaintiff had sufficiently alleged discriminatory animus on the part of Defendants, the intracorporate immunity doctrine would likely doom Plaintiff's claim under § 1985(3).  *See Murray v. Lakeland Cent. Dist. Bd. of Ed.*, No. 16-CV-6795, 2017 WL 4286658, at *10 n.10 (S.D.N.Y. Sept. 26, 2017) ("[T]he plaintiff's conspiracy claims are barred by the intracorporate conspiracy doctrine, as the . . . [d]efendants all worked for the [same] [s]chool [d]istrict." (collecting cases)); *Rosenberg v. City of New York*, No. 09-CV-4016, 2011 WL 4592803, at *12–13 (E.D.N.Y. Sept. 30, 2011) (finding that the plaintiff's allegations that school administrators conspired against him in violation of 1985(3) were barred by the intracorporate conspiracy doctrine); *Talley v. Brentwood Union Free Sch. Dist.*, 728 F. Supp. 2d 226, 233–34 (E.D.N.Y. 2010) (holding that the plaintiff's claims under § 1985(3) were barred when all of the individuals alleged to be part of the conspiracy were members of the "same public entity," which was a board of education).

---

[10] Although Plaintiff alleges that Broderick is the President of WPTA, he also states that she is a science teacher at WPHS.  (TAC ¶¶ 12, 17.)

### 3.  Violation of the Collective Bargaining Agreement

Plaintiff alleges that Defendants violated the CBA on several occasions.  Specifically, Plaintiff claims that the CBA entitled him to a written explanation of the reason for his reassignment, (TAC ¶¶ 29, 32), and the right to compensation when he was allegedly absent due to injury resulting from his employment, (*id.* ¶ 52).

Plaintiff's "proposed claim[s] for breach of the CBA [are] inextricably intertwined with the CBA and would require the [C]ourt to interpret the terms or legal consequences of a breach of the agreement."  *Shearon v. Comfort Tech. Mech. Co., Inc.*, 936 F. Supp. 2d 143, 158 (E.D.N.Y. 2013) (citation and quotation marks omitted).  Therefore, "[t]o the extent Plaintiff styles this claim as a common law breach of contract claim, it is preempted by the [Labor Management Relations Act ("LMRA")]."  *Id.* (citing *Vera v. Saks & Co.*, 335 F.3d 109, 114 (2d Cir. 2003)).  Generally, "before an employee may sue h[is] employer for breaching a CBA, that 'employee is required to exhaust any grievance or arbitration remedies provided in the collective bargaining agreement.'"  *Doyle v. United Airlines, Inc.*, 914 F. Supp. 2d 325, 338 (E.D.N.Y. 2012) (footnote omitted) (quoting *DelCostello v. Int'l Bhd. of Teamsters*, 462 U.S. 151, 164 (1983)).  Accordingly, "[a]ny claims that are governed by the CBA and have not been grieved . . . pursuant to the contract must be dismissed because Plaintiff has failed to exhaust h[is] administrative remedies pursuant to the CBA."  *Collaku v. Temco Serv. Indus., Inc.*, No. 18-CV-4054, 2019 WL 452052, at *10 (S.D.N.Y. Feb. 5, 2019).  Here, beyond generally stating that he filed "complaints" about "discrimination, harassment, hostile and unsafe work environment," (TAC ¶¶ 41, 54), Plaintiff has not alleged that he exhausted the full grievance process provided for in the CBA.  (*See* Smith Decl. Ex. D ("CBA"), at 7–8 (laying out the requisite "procedure stages" for filing a grievance, which include filing a grievance with the principal or "immediate

superior," then the superintendent, then the "President of the Association," depending on

whether the employee is "satisfied with the disposition of his/her grievance," or whether a

decision has been rendered in a certain amount of time) (Dkt. No. 71-4).)  Nor has Plaintiff

alleged that "the union as bargaining agent breached its duty of fair representation in its handling

of the employee's grievance," an exception to the exhaustion requirement.  *Doyle*, 914 F. Supp.

2d at 338 (quotation marks omitted) (quoting *Vaca v. Sipes*, 386 U.S. 171, 186 (1967)); *see also*

*Sussman v. NYP Holdings, Inc.*, No. 16-CV-7659, 2018 WL 2357256, at *4 (S.D.N.Y. Feb. 22,

2018) ("[A]n employee seeking a remedy for an alleged breach of the [CBA] between his union

and employer *must* attempt to exhaust any exclusive grievance and arbitration procedures

established by that agreement . . . and is excepted from exhausting the grievance procedure only

if the employee can carry the burden of demonstrating breach of duty by the [u]nion." (emphasis

in original) (quotation marks omitted) (quoting *Clayton v. Int'l Union, United Auto., Aerospace*

*and Agric. Implement Workers of Am.*, 451 U.S. 679, 681 (1981); *United Parcel Servs., Inc. v.*

*Mitchell*, 451 U.S. 56, 62 (1981))).  And, even if Plaintiff were to make such an allegation, it

would be "a hybrid § 301/duty of fair representation claim," *Arnold v. Beth Abraham Health*

*Servs., Inc.*, No. 09-CV-6049, 2009 WL 5171736, at *2 (S.D.N.Y. Dec. 30, 2009) (quotation

marks omitted) (quoting *Sanozky v. Int'l Ass'n of Machinists & Aerospace Workers*, 415 F.3d

279, 282 (2d Cir. 2005)), which the Court has already determined is time-barred, (*see* 2019 Op.

31); *see Black v. Anheuser-Bush In Bev*, 220 F. Supp. 3d 443, 449–50 (S.D.N.Y. 2016) (holding

that because the court had previously dismissed the plaintiff's "hybrid LMRA [§] 301" claim as

time-barred, that decision was the "law of the case").  As such, "the Court's dismissal of

Plaintiff's hybrid LMRA [§] 301 breach-of-contract/breach of duty of fair representation claim in

its prior [Opinion] necessarily dismissed any breach-of-contract claim against [Plaintiff's

employer]." *Id.* at 449; *see also Carrion v. Enter. Ass'n, Metal Trades Branch Local Union 638*, 227 F.3d 29, 34 (2d Cir. 2000) ("[The employee's] claims against [the employer] and the [u]nion cannot be separated . . . . Even if [the employee] had sued only [the employer] for violating the CBA . . . he would still have been required to show that the union breached its duty of fair representation."). Accordingly, the Court again dismisses Plaintiff's claims related to alleged violations of the CBA. *See Sussman*, 2018 WL 2357256, at *4 (dismissing the plaintiffs' CBA violation-related claims when the plaintiffs "neither plausibly alleged that they exhausted the grievance procedure in the CBA nor plausibly alleged a cognizable excuse for their failure to do so").[11, 12]

---

[11] As the Court noted previously, although Plaintiff construes his § 1983 claim as based on violations of Title VII, (TAC ¶¶ 63–64), a § 1983 claim is precluded by a Title VII claim unless "the former is based on substantive rights *distinct* from Title VII." *Saulpaugh v. Monroe Cmty. Hosp.*, 4 F.3d 134, 143 (2d Cir. 1993) (emphasis added) (citation and quotation marks omitted); *see also id.* ("A plaintiff cannot use [§] 1983 to gain perceived advantages not available to a Title VII claimant, but a plaintiff can assert a claim under [§] 1983 if some law other than Title VII is the source of the right alleged to have been denied." (citation omitted)). The Court will therefore construe Plaintiff's § 1983 claim as relating only to his constitutional claims under the Fourteenth Amendment, and will not dismiss Plaintiff's claims under § 1983 as based "exclusively on the alleged violations of his rights under Title VII," (Defs.' Mem. 9), as Defendants suggest the Court should do.

[12] Defendants implore the Court to dismiss Plaintiff's claims under the Fourteenth Amendment, arguing that "the TAC makes clear that Plaintiff was classified []as a probationary employee at the time his employment was terminated and, as such, did not have a property interest in his continued employment." (Defs.' Mem. 10 (citations omitted).) Defendants also argue that "adequate due process was available to [Plaintiff] at the time through the terms of the [CBA]." (*Id.*) However, the Court previously denied the White Plains Defendants' Motion To Dismiss Plaintiff's procedural due process claims, finding that it could not "definitively determine from Plaintiff's allegations whether he had a property interest in his employment such that he was entitled to a pre-termination hearing." (2019 Op. 38–40.) Defendants' present arguments are similar, if not identical, to those that the Court previously considered and rejected. (*See* Defs.' Mem. in Supp. of Mot. To Dismiss the SAC 17–20 (Dkt. No. 45).) Further, the TAC does not make substantially different allegations from the SAC on these points. (*See* SAC ¶ 78 (alleging that after Plaintiff was informed that he would be terminated, but before his actual termination, the "WPCSD Superintendent recommended to the Board to retroactively convert Plaintiff's leave-replacement appointment to a probationary appointment and the Board approved

III.  Conclusion

For the foregoing reasons, Defendants' Motion To Dismiss is granted in part and denied in part.  Plaintiff's claims alleging retaliation with respect to his complaints of discrimination and harassment at WPCSD, violations of 42 U.S.C. § 1985(3), and violations of the CBA are dismissed with prejudice, as are Plaintiff's claims under Title VII as to Smith and Doherty.[13] However, Plaintiff's Title VII claims against WPCSD alleging retaliation with respect to his lawsuit against ERCSD and his procedural due process claim based on his termination without a prior hearing survive the instant Motion.  The Court will hold a Status Conference as to these remaining claims on October 8, 2020 at 11:00 a.m.

The Clerk of Court is respectfully directed to terminate the pending Motion, (Dkt. No. 69), and to mail a copy of this Opinion & Order to Plaintiff.

SO ORDERED.

DATED:    September 24, 2020
          White Plains, New York

_____
KENNETH M. KARAS
UNITED STATES DISTRICT JUDGE

---

it"); TAC ¶ 46 (same).)  Accordingly, the Court again denies Defendants' Motion to Dismiss Plaintiff's claims under the Fourteenth Amendment.

[13] The Court dismisses these claims with prejudice, as Plaintiff has already had a second bite at the apple with his TAC.  *See Denny v. Barber*, 576 F.2d 465, 471 (2d Cir. 1978) (holding that the plaintiff was not entitled to "a third go-around"); *Melvin v. County of Westchester*, No. 14-CV-2995, 2016 WL 1254394, at *24 n.19 (S.D.N.Y. Mar. 29, 2016) (granting motion to dismiss with prejudice where "[the] [p]laintiff has already had two bites at the apple, and they have proven fruitless" (citation, alterations, and quotation marks omitted)); *Anthony v. Brockway*, No. 15-CV-451, 2015 WL 5773402, at *3 (N.D.N.Y. Sept. 30, 2015) (dismissing amended complaint with prejudice where the "[p]laintiff has already been given one opportunity to amend his complaint . . . , and there is nothing in his second amended complaint suggesting that [he] could do better given another opportunity").